1
2
3
4
5
6
7
8
9

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SPOKANE RIVERKEEPER, a program of the Center for Justice<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>Defendant. | NO.<br><br><br>COMPLAINT |

**NATURE OF ACTION**

1.      This action challenges the Environmental Protection Agency's ("EPA") decision to approve a Total Maximum Daily Load ("TMDL") for the Hangman Creek, ordering defendants to comply with the requirements of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*  The decision approving the TMDL was arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with law.

2.      Hangman Creek is a waterbody that has suffered from terrible water quality caused by poor farming practices for years.  Pollutants such as fecal coliform, turbidity, and high

COMPLAINT - 1

Bricklin & Newman, LLP
Attorneys at Law
1001 Fourth Avenue, Suite 3303
Seattle WA 98154
Tel.  (206) 264-8600
Fax. (206) 264-9300

water temperature have impaired Hangman Creek to levels well below those established by the Clean Water Act ("CWA").

3.      The sources of pollution in the Hangman Creek Watershed are numerous and diverse.  Agricultural pollution is by far the biggest source of pollution throughout the watershed.  Poor agricultural practices, such as animal waste runoff, inadequate soil tillage, and a lack of riparian buffers, are frequent nonpoint sources of pollution.  Point sources of pollution in the watershed include multiple wastewater treatment plants.

4.      The CWA contemplates that adequate water quality will be achieved by the use of the National Pollutant Discharge Elimination System ("NPDES") permits issued to point sources of pollution.  When the NPDES permits do not achieve adequate water quality standards for a water body, the CWA requires that a Total Maximum Daily Load ("TMDL") be established.  A TMDL accounts for all point sources of pollution and all nonpoint sources of pollution and then determines the level that each source of pollution needs to be reduced in order to achieve adequate water quality standards.

5.      Under the CWA, either Ecology or the EPA is required to establish a TMDL for impaired waters "at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality."   33 U.S.C. § 1313(d)(1)(C).   If Ecology creates a TMDL, the EPA must either approve the TMDL or disapprove the TMDL.  If EPA disapproves the submitted TMDL, the EPA is responsible for establishing a new TMDL. 33 U.S.C. § 1313(2).

6.      In order to begin the process of improving water quality in Hangman Creek, the Washington Department of Ecology ("Ecology") created a TMDL for fecal coliform, total

COMPLAINT - 2

Bricklin & Newman, LLP
Attorneys at Law
1001 Fourth Avenue, Suite 3303
Seattle WA 98154
Tel.  (206) 264-8600
Fax. (206) 264-9300

suspended solids, and temperature within Hangman Creek.  As required by the CWA, Ecology submitted the Hangman Creek TMDL to the Environmental Protection Agency ("EPA") for approval.

7.      The EPA approved the Hangman Creek TMDL on September 29, 2009.  However, the EPA ignored the CWA and EPA's own long-standing regulations and policies that guide approvals of TMDLs and provided no explanation why it was deviating from its policies. Specifically, the EPA ignored its own policies that require adequate reasonable assurances that nonpoint sources of pollution will be reduced in impaired waters polluted by both point sources and nonpoint sources of pollution.  *See Guidance for Water Quality-Based Decisions: the TMDL Process*, EPA440/4-91-001 (April 1991) ("In order to allocate loads among both point and nonpoint sources, there must be reasonable assurances that nonpoint source loads will in fact be achieved.  Where there are not reasonable assurances, under the CWA, the entire load reductions must be assigned to point sources."); *New Policies for Establishing and Implementing Total Maximum Daily Loads* (1997) ("[W]here any wasteload allocation to a point source is increased based on an assumption that loads from nonpoint sources will be reduced, the State must provide 'reasonable assurances' that the nonpoint source load allocations will in fact be achieved."); *Guidelines for Reviewing TMDLs under Existing Regulations Issued in 1992* (2002) ("When a TMDL is developed for waters impaired by both point and nonpoint sources, and the WLA is based on an assumption that nonpoint source load reductions will occur, EPA's 1991 TMDL Guidance states that the TMDL should provide reasonable assurances that nonpoint source control measures will achieve expected load reductions in order for the TMDL to be approvable."). The EPA also ignored CWA requirements to establish an adequate margin of

COMPLAINT - 3

**Bricklin & Newman, LLP**
Attorneys at Law
1001 Fourth Avenue, Suite 3303
Seattle WA 98154
Tel.  (206) 264-8600
Fax. (206) 264-9300

safety in the TMDL and to establish loads at a level to implement applicable water quality standards.

8.      Plaintiff requests that the Court set aside the TMDL approval pursuant to 5 U.S.C. § 706(2)(a) and enjoin EPA to create a new TMDL which complies with the requirements of the CWA.

9.      Plaintiff seeks a declaratory judgment, injunctive relief, an award of costs and expenses of suit, including attorney and expert witness fees pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, and such other relief as this Court deems just and proper.

**JURISDICTION**

10.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States and involves the United States as a defendant, and under the APA, 5 U.S.C. § 702, providing for judicial review of final agency action.  The Court can grant declaratory and injunctive relief under 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and under 5 U.S.C. §§ 701-706 for violations of the APA and the CWA.

11.      Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because EPA is an agency of the United States, EPA Region 10 headquarters is in this judicial district.

**PARTIES**

12.      Plaintiff Spokane Riverkeeper is a program of the Center for Justice, a non-profit organization, incorporated under the laws of Washington and recognized by the Internal Revenue Service as a tax-exempt organization under Section 501(c)(3) of the Internal Revenue Code. Spokane Riverkeeper's donors and supporters reside on or near or recreate in the Spokane River

COMPLAINT - 4

Bricklin & Newman, LLP
Attorneys at Law
1001 Fourth Avenue, Suite 3303
Seattle WA 98154
Tel. (206) 264-8600
Fax. (206) 264-9300

Watershed. Spokane Riverkeeper is located at 35 W. Main Avenue, Suite 300, Spokane, WA 99201. Spokane Riverkeeper is dedicated to protecting and restoring the health of the Spokane River Watershed. Spokane Riverkeeper accomplishes its goals by collaborating, educating, and, when necessary, litigating to preserve the Spokane River's health through the Clean Water Act and other laws. The goal of Spokane Riverkeeper is to achieve a fishable and swimmable Spokane River.

13.     Defendant EPA is the federal agency charged with the administration and enforcement of the CWA.  EPA retains final approval and oversight of state-run water quality programs under the CWA, including approval of water quality standards and TMDLs issued by states.  EPA is headquartered in Washington, D.C.  EPA Region 10 is headquartered in Seattle, Washington.  EPA Region 10 provided the final approval of the Hangman Creek TMDL.  EPA Region 10 is located at 1200 6th Avenue, Suite 900, Seattle, WA 98101.

<b>STATEMENT OF STANDING</b>

14.     The interests at stake in this matter are germane to Plaintiff Spokane Riverkeeper's organizational purposes.  The EPA's violations of law as set forth in the claims for relief herein threaten the water quality of Hangman Creek and the Spokane River, preservation of wildlife and fish in Hangman Creek and the Spokane River, and the use and enjoyment of the Hangman Creek and Spokane River for Plaintiff's members.

15.     Plaintiff and its members recreate, fish, swim, and otherwise use and enjoy the Spokane River and its tributary Hangman Creek.  Plaintiff and its members plan to continue their use and enjoyment of the Spokane River and its tributary Hangman Creek in the future.  Plaintiff and its members also participate in information gathering and dissemination, education and public outreach, commenting upon proposed agency actions, serving on advisory committees, and

COMPLAINT - 5

Bricklin & Newman, LLP
Attorneys at Law
1001 Fourth Avenue, Suite 3303
Seattle WA 98154
Tel.  (206) 264-8600
Fax. (206) 264-9300

other activities relating to Ecology and EPA's management and administration of the Spokane River and its tributary Hangman Creek.

16.     Defendant EPA's unlawful approval of the Hangman TMDL adversely affects Plaintiff's organizational interests, as well as its members' use and enjoyment of the Spokane River and Hangman Creek. The interests of the Plaintiff and its members have been and will continue to be injured and harmed by the EPA's unlawful approval of the Hangman Creek TMDL. This decision is particularly and directly harmful to Plaintiff's interests because Defendant EPA has failed to perform its duties under federal law as set forth herein. Unless the relief prayed for herein is granted, Plaintiff and its members will suffer ongoing and irreparable harm and injury to their interests.

17.     The injures to Plaintiff Spokane Riverkeeper are likely to be redressed by a favorable decision of this Court because an order granting the relief requested in this Complaint would ensure that the TMDL is in compliance with federal law and not result continued degraded water quality of Hangman Creek and the Spokane River.

**STATUTORY AND REGULATORY FRAMEWORK**

18.     TMDLs are the backstop of a detailed statutory and regulatory framework under the CWA that provides the last regulatory resort of improving water quality.

**Overview of the Clean Water Act**

19.     The CWA provides a series of actions that the regulatory body can take to improve water quality standards: (i) establishment of water quality standards by the states and approved by EPA under Section 303(c); (ii) issuance of National Pollutant Discharge Elimination System ("NPDES") permits to point sources of pollution with pollutant limits designed to meet applicable water quality standards; (iii) identification by the states of certain waters that are not

COMPLAINT - 6

Bricklin & Newman, LLP
Attorneys at Law
1001 Fourth Avenue, Suite 3303
Seattle WA 98154
Tel. (206) 264-8600
Fax. (206) 264-9300

meeting water quality standards under Section 303(d) (commonly called "impaired" waters); and (iv) calculation by the states or EPA of a total maximum daily pollutant load—a TMDL—for such impaired waters under Section 303(d).

20.     The CWA divides sources of pollutants to waterways into two major categories: "point sources" and "nonpoint sources." "Point source" is defined at 33 U.S.C. § 1362 to mean "any discernible, confined, and discrete conveyance including…any pipe, ditch, channel, tunnel, [or] conduit…from which pollutants are or may be discharged." The term also includes those livestock and poultry operations that qualify under EPA regulations as a "concentrated animal feeding operation." Nonpoint sources are not defined at 33 U.S.C. § 1362 and are not regulated under the NPDES program. However, Ecology has the power to regulate nonpoint sources of pollution under the Washington State Water Pollution Control Act. *See Lemire v. Department of Ecology*, 178 Wn.2d 227 (2013).

21.     All pollutant discharges to waters of the United States from point sources are prohibited under the CWA unless otherwise specifically authorized under separate sections of the CWA. One primary way in which discharges are authorized is under a Section 402 permit, known as a NPDES permit. *Id*. at § 1342. The NPDES permitting system imposes limits on such discharges based on the application of technology, or the need to achieve water quality standards, whichever is more stringent. *Id*. §§ 1311(b), 1312. States can assume primary responsibility for administration and enforcement of the NPDES permitting program if the state's program is approved by the EPA. *Id*. § § 1342(b), 1342(c)(1). Otherwise, EPA is responsible for the NPDES permitting system in that particular state. *Id*. § 1342(a). EPA retains authority to object to a particular NPDES permit that authorizes discharges to waters within the statute's jurisdiction. *Id*. § 1342(d); 40 C.F.R. § 123.44.

COMPLAINT - 7

**Bricklin & Newman, LLP**
Attorneys at Law
1001 Fourth Avenue, Suite 3303
Seattle WA 98154
Tel.  (206) 264-8600
Fax. (206) 264-9300

## Development of Water Quality Standards

22.     Each state must designate one or more uses for its water bodies, and then must develop water quality criteria for each water body necessary to protect these designated uses, taking into account the water body's use and value for public water supplies, propagation of fish and wildlife, recreational, agricultural, and industrial purposes, use for navigation, and other purposes.  33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. §§ 131.10 and 131.11.  These criteria can be expressed for a pollutant as specific numeric quantities or as general narrative statements, but in either case, must be based on "sound scientific rationale."  40 C.F.R. § 131.11(a).  The standards adopted by the states are subject to EPA review and approval to ensure that they are consistent with CWA requirements.  33 U.S.C. § 1313(c)(3)-(4).  If the EPA determines that the water quality standards promulgated by the states are not consistent with the CWA, then the EPA can disapprove the standards and promulgate its own water quality standards for the state.  *Id.* § 1313(c)(3).

## Development of TMDLs for Impaired Waters

23.     Section 303(d) of the CWA directs each state to first identify those waters within its boundaries for which technology-based NPDES permit limitations are not stringent enough to implement the applicable water quality standards, and then each state must establish a priority ranking of these waters, taking into account the severity of the pollution and the waters' designated uses.  33 U.S.C. § 1313(d)(1)(A).  The state must establish a TMDL for each listed water (commonly referred to as "impaired" waters) for pollutants identified by EPA as suitable for such calculation.  *Id.* § 1313(d)(1)(C).  This TMDL must be established "at a level necessary to implement the applicable water quality standards," accounting for seasonal variations and a margin of safety.  *Id.*  EPA retains final approval of TMDLs, and the EPA can create its own

COMPLAINT - 8

Bricklin & Newman, LLP
Attorneys at Law
1001 Fourth Avenue, Suite 3303
Seattle WA 98154
Tel.  (206) 264-8600
Fax. (206) 264-9300

1   TMDL if the state's TMDL does not set loads at levels necessary to implement water quality

2   standards.  *Id.*

3       24.     A TMDL is the measure of the total amount of pollutant that can be "loaded" into

4   a waterbody and still meet water quality standards.  From this total number, portions of the total

5   load are allocated to individual sources of pollution.  Under EPA regulations, a TMDL is the sum

6   of both "wasteload allocations" ("WLAs")—the portion of the receiving water loading capacity

7   allocated to each of its existing or future point sources of pollution—and "load allocations"

8

9   ("LAs")—the loading capacity portions attributed to the water body's "existing or future

10  nonpoint sources of pollution or to natural background sources."  40 C.F.R. § 130.2.

11                          **The Elements of a TMDL**

12      **25.**     Waters that are polluted by point and nonpoint sources of pollution have an

13  additional requirement under EPA policy.  After the necessary LAs and WLAs have been

14  allocated to sources of pollutants, EPA policy requires a TMDL to establish reasonable

15  assurances that WLAs for nonpoint sources of pollution will be achieved in order to not allocate

16  all reductions to LAs from point sources of pollution.  *See* 2002 "Guidelines for Reviewing

17

18  TMDLs under Existing Regulations Issued in 1992."

19                            **FACTUAL BACKGROUND**

20                          **The Hangman Creek Watershed**

21      26.     Hangman Creek is a trans-boundary watershed that begins in the foothills of the

22

23  Rocky Mountains of northern Idaho, extends over the southeastern portion of Spokane County,

24  Washington, and terminates as a tributary of the Spokane River.  The entire Hangman Creek

25  watershed encompasses an area of over 689 square miles.

26

COMPLAINT - 9

**Bricklin & Newman, LLP**
Attorneys at Law
1001 Fourth Avenue, Suite 3303
Seattle WA 98154
Tel.  (206) 264-8600
Fax. (206) 264-9300

27.     The Hangman Creek watershed is dominated by dryland farming.  Wheat, cattle, hogs, and other agriculture is common throughout the watershed.  The Hangman Creek watershed has experienced an increase in urbanization and a change in land use practices, especially near its terminus with the Spokane River, but the farming is the predominant land use throughout the watershed.

28.     Poor farming practices have left Hangman Creek in dire ecological health.  Cattle and other livestock are often allowed to graze directly next to, and sometimes in, the water.  Farmlands used for wheat production are often tilled and left to lie fallow, which results in large amounts of soil being swept away into Hangman Creek.  Fields are often tilled and planted right up to the edge of the creek with no riparian buffers.  This results in higher water temperatures due to a lack of shade.  The lack of riparian buffers also cause erosion of streambanks, furthering contributing to the poor water quality.  Overall, the ecological health of the stream has greatly suffered thanks to poor farming practices throughout the watershed.

**The Hangman Creek TMDL**

29.     In 1998, Ecology identified several parts of Hangman Creek as impaired for not meeting state water quality standards for fecal coliform, dissolved oxygen, pH, and temperature.  Parts of Hangman Creek have remained on the impaired waters list ever since then.

30.     In response to Hangman Creek's inclusion on the impaired waters list, Ecology began developing a TMDL for three pollutants that have plagued the waterbody: fecal coliform, turbidity, and temperature.

31.     Fecal coliform is a reliable indicator of the presence of disease-carrying organisms which can pose a direct threat to human health.  When fecal coliform bacteria are present in high numbers in a water sample, it means that the water has received fecal matter from an outside

COMPLAINT - 10

Bricklin & Newman, LLP
Attorneys at Law
1001 Fourth Avenue, Suite 3303
Seattle WA 98154
Tel.  (206) 264-8600
Fax. (206) 264-9300

source.  Many areas in the Hangman Creek watershed have fecal coliform counts high enough to pose a health risk to swimmers, fisherman, and others.  The majority of fecal coliform is produced by livestock, but wastewater treatment plants, stormwater discharges, and leaking septic tanks can also contribute fecal coliform to the waterbody.

32.  Water temperature is another important marker of ecological health in a stream. Elevated temperature typically decreases the level of dissolved oxygen of water.  This can negatively impact aquatic wildlife by literally asphyxiating them due to a lack of oxygen.  The lack of oxygen caused by warmer water also can lead to anaerobic conditions, which lead to increased bacteria levels when there is an ample food supply.  In the Hangman Creek watershed, a lack of shade is the main contributing factor to increased water temperature.  Farmlands are often tilled to the very edge of the water and do not leave a riparian buffer, such as willows or other shade-producing trees.  The cumulative result is a waterbody that is simply too warm to be healthy.

33.  Turbidity refers the measure of total suspended solids ("TSS") present in water. The solids can include a wide variety of material, such as silt, decaying plant and animal matter, industrial wastes, and sewage.  In Hangman Creek, the main cause of turbidity is silt caused by soil runoff from farmlands.  Since 1939, total erosion on Palouse region cropland has averaged 360 tons per acre—more than 9 tons per acre per year.  Streams, such as Hangman Creek, are forced to serve as the conduits for all of the eroded soil.  High TSS can block light from reaching submerged vegetation, leading to a decrease in vegetation growth and a decrease in dissolved oxygen produced.  Increased sediment can also clog fish gills, reduce growth rates, decrease resistance to disease, and prevent egg and larval development.  Once suspended solids settle to the bottom of a waterbody, the solids can smother the eggs of fish and aquatic insects.  Finally,

COMPLAINT - 11

Bricklin & Newman, LLP
Attorneys at Law
1001 Fourth Avenue, Suite 3303
Seattle WA 98154
Tel.  (206) 264-8600
Fax. (206) 264-9300

the highly turbid water can severely hamper the aesthetic quality of the waterbody by creating cloudy water.  Hangman Creek suffers from high turbidity, especially during storm events which wash soils from farmlands into the water.  The highly turbid water of Hangman Creek dumps directly into the Spokane River, where it often creates a visible mixing line with the clearer water of the Spokane River.

34.    After evaluating the Hangman Creek watershed, Ecology developed a TMDL which set WLAs and LAs for fecal coliform, temperature, and turbidity through the Hangman Creek watershed in Washington.  The TMDL covered 446 square miles of the 689 square miles of the total watershed—the remaining 243 square miles of the watershed occurring in Idaho.

35.    Hangman Creek and its tributaries have not been given any specific use designations in the water quality standards.  Under Washington Administrative Code 173-201A-600, default water quality standards apply.  The designated uses to be protected are : Salmonid spawning rearing, and migration; primary contact recreation; domestic, industrial, and agricultural water supply; stock watering; wildlife habitat; harvesting; commerce, and navigation; boating; and aesthetic values.

36.    The TMDL focuses on water quality criteria derived from the beneficial uses of recreation and aquatic habitat.  The TMDL does not derive water quality criteria from the beneficial use of aesthetic values, despite the fact that Hangman Creek's aesthetic value is often impaired due to high turbidity levels.

37.    The TMDL identifies the amount of reductions in pollutants necessary from WLAs or LAs necessary to meet water quality standards.  This is accomplished by identifying certain sites, such as the mouths of tributaries to Hangman Creek or Hangman Creek where it intersects certain roads, and then identifying the reduction in a pollutant at a certain site necessary

COMPLAINT - 12

Bricklin & Newman, LLP
Attorneys at Law
1001 Fourth Avenue, Suite 3303
Seattle WA 98154
Tel.  (206) 264-8600
Fax. (206) 264-9300

to meet water quality standards.  For example, Ecology identified that Hangman Creek at Keevy Road would need a 78% reduction in fecal coliform LAs in order to achieve the water quality standards for fecal coliform in the watershed.  Ecology determined that some sites needed drastic reductions in LAs in order to meet water quality standards—up to 92% in some cases.

38.    Ecology did not require any further reductions in WLAs from six municipal wastewater treatment plants in the watershed, except for a reduction in the fecal coliform WLA for the Tekoa wastewater treatment plant.  Ecology determined that the existing limits on pollutants established in each treatment plants NPDES permit was adequate to meet water quality standards.

39.    In effect, Ecology placed all of the burden for meeting water quality standards on reducing pollutants from nonpoint sources of pollution and the LAs assigned to them.

**Inadequacies of the TMDL**

40.    Reducing primarily LAs from nonpoint sources and not WLAs from point sources to meet water quality standards was done because the vast majority of pollution in Hangman Creek originated from nonpoint sources of pollution.

41.    However, in order to allow WLAs to remain the same, EPA policy requires the TMDL to contain "reasonable assurances" that LAs will be reduced.  For instance, EPA's 2002 policy, "Guidelines for Reviewing TMDLs under Existing Regulations," states in part:

> When a TMDL is developed for waters impaired by both point and nonpoint sources, and the WLA is based on an assumption that nonpoint source load reductions will occur, EPA's 1991 TMDL Guidance states that the TMDL should provide reasonable assurances that nonpoint source control measures will achieve expected load reductions in order for the TMDL to be approvable.  This information is necessary for EPA to determine that the TMDL, including the load and wasteload allocations, has been established at a level necessary to implement water quality standards.

COMPLAINT - 13

Bricklin & Newman, LLP
Attorneys at Law
1001 Fourth Avenue, Suite 3303
Seattle WA 98154
Tel.  (206) 264-8600
Fax. (206) 264-9300

1
2
Guidelines for Reviewing TMDLs under Existing Regulations Issued in 1992 (2002).  The logic is

3
simple: reductions in pollutants must come from somewhere. So if WLAs are not being reduced,

4
then there must be some sort of reasonable assurance that LAs will be reduced.  If there are no

5
reasonable assurances that LAs are going to be reduced, then under the CWA, the entire load

6
reductions must be assigned to point sources.  Simply identifying the amount of pollutant reduction

7
necessary from LAs is not enough.  There must be a reasonable assurance that those LA reductions

8
9
will occur—otherwise the burden falls to WLAs from point sources.

10
       42.     The Hangman Creek TMDL fails to provide the reasonable assurances that LAs

11
will be reduced enough to satisfy the CWA.  The "Reasonable Assurances" section of the

12
Hangman Creek TMDL is essentially a list of organizations that might be able to provide

13
assistance implementing best management practices for nonpoint sources of pollution at

14
unspecified locations in the watershed at some unspecified point in the future.

15
16
       43.     The "Reasonable Assurances" section of the Hangman Creek TMDL does not

17
include reasonable assurances of LA reductions that are enforceable, transparent, not voluntary,

18
or currently funded.  In effect, the "reasonable assurances" identified in the Hangman Creek

19
TMDL are meaningless.

20
       44.     Without adequate reasonable assurances, the loads determined within the

21
Hangman Creek TMDL will not all implement applicable water quality standards.

22
       45.     The CWA requires each TMDL to employ a "margin of safety which takes into

23
account any lack of knowledge concerning the relationship between effluent limitations and water

24
quality."  33 U.S.C. 1313(d)(1)(C).  Ecology used an "implicit" margin of safety within the

25
Hangman Creek TMDL.  An explicit margin of safety sets aside a portion of the load capacity

26

COMPLAINT - 14

**Bricklin & Newman, LLP**
Attorneys at Law
1001 Fourth Avenue, Suite 3303
Seattle WA 98154
Tel.  (206) 264-8600
Fax. (206) 264-9300

specifically for the margin of safety, but an implicit margin of safety relies upon conservative assumptions in the use of data and the application of models.

46.     The implicit margin of safety in the Hangman Creek TMDL relies upon the assumption that reductions in LAs will actually occur and that the WLAs and LAs are set a levels that will implement water quality standards.   Unfortunately, both of these assumptions are incorrect and the margin of safety established in the TMDL is not adequate.

47.     Despite these inconsistencies with the CWA and EPA regulations and policy, the EPA approved the Ecology-created Hangman Creek TMDL on September 29, 2009.  EPA did not give any explanation why it was deviating from its well established policies.

48.     Since the adoption of the TMDL, Hangman Creek has continued to suffer degraded water quality.  Segments of the stream remain on the impaired waters list established by Ecology.  Poor agricultural practices remain the main source of pollutants in the Hangman Creek watershed.

## FIRST CLAIM FOR RELIEF

### Failure to Include Reasonable Assurances and an Adequate Margin of Safety

### (Pursuant to the APA, 5 U.S.C. § 702)

49.     The foregoing paragraphs are realleged and incorporated by reference.

50.     The Hangman Creek TMDL assigns WLAs to point sources of pollution in the TMDL that are based on the assumption that LAs from nonpoint sources of pollution will be reduced.

51.     The Hangman Creek TMDL does not contain adequate reasonable assurances of LA reduction.

52.     The Hangman Creek TMDL does not contain an adequate margin of safety.

COMPLAINT - 15

**Bricklin & Newman, LLP**
Attorneys at Law
1001 Fourth Avenue, Suite 3303
Seattle WA 98154
Tel.  (206) 264-8600
Fax. (206) 264-9300

53.     Despite the lack of reasonable assurances, EPA approved the Hangman Creek TMDL without any explanation or justification of why its own policy was not applicable.

54.     Without adequate reasonable assurances, EPA has approved a TMDL with WLAs and LAs at levels that will not implement applicable water quality standards, in violation of 33 U.S.C. § 1313(d)(1)(C).

55.     For these reasons, EPA's approval of the Hangman Creek TMDL is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law in violation of 5 U.S.C. § 706.

56.     Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA, 28 U.S.C. § 2412.

## SECOND CLAIM FOR RELIEF

### Failure to Address All Applicable Water Quality Standards

### (Pursuant to the APA, 5 U.S.C. § 702)

57.     The foregoing paragraphs are realleged and incorporated by reference.

58.     The Hangman Creek TMDL does not address all applicable water quality standards, in violation of 33 U.S.C. § 1313(d)(1)(C) and EPA's implementing regulations at 40 C.F.R. Part 130.   Specifically, the Hangman Creek TMDL does not address the beneficial designated use of aesthetic values.

59.     For these reasons, EPA's approval of the Hangman Creek TMDL is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law in violation of 5 U.S.C. § 706.

60.     Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA, 28 U.S.C. § 2412.

COMPLAINT - 16

**Bricklin & Newman, LLP**
Attorneys at Law
1001 Fourth Avenue, Suite 3303
Seattle WA 98154
Tel.  (206) 264-8600
Fax. (206) 264-9300

1

**PRAYER FOR RELIEF**

2

WHEREFORE, Plaintiff Spokane Riverkeeper respectfully requests this Court to enter

3

judgment in its favor, and:

4

1.      Declare that the Hangman Creek TMDL is contrary to federal law, including the

5

6

Clean Water Act, federal regulations, and EPA policies, or is otherwise arbitrary, capricious, or

7

an abuse of discretion.

8

2.      Vacate the Hangman Creek TMDL.

9

3.      Enjoin and require EPA to issue a TMDL that conforms to the requirements of the

10

Clean Water Act and Administrative Procedure Act as ordered by this Court.

11

4.      Award the Plaintiff their costs, expenses, expert witness fees, and reasonable

12

13

attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act, Clean

14

Water Act, and all other applicable authorities; and

15

5.      Grant Plaintiff Spokane Riverkeeper such other relief as may be necessary and

16

appropriate or as the Court deems just and proper.

17

Dated this 28th day of September, 2015.

18

Respectfully submitted,

19

BRICKLIN & NEWMAN, LLP

20

21

By:      s/ Bryan Telegin

22

Claudia M. Newman, WSBA No. 24928
Bryan Telegin, WSBA No. 46686

23

1001 Fourth Avenue, Suite 3303
Seattle, WA  98154

24

Telephone (206) 264-8600
Facsimile (206) 264-9300

25

newman@bnd-law.com

26

telegin@bnd-law.com
Attorneys for Plaintiff

COMPLAINT - 17

**Bricklin & Newman, LLP**
Attorneys at Law
1001 Fourth Avenue, Suite 3303
Seattle WA 98154
Tel.  (206) 264-8600
Fax. (206) 264-9300